1
JEFFREY D. FARROW, ESQ. SBN 180019
**MICHELMAN & ROBINSON, LLP**
4 Hutton Centre Drive, Suite 300
Santa Ana, CA 92707
Telephone:   714-557-7990
Facsimile:    714-557-7991

Attorneys for Defendant AMERICAHOMEKEY, INC.

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BARDIN, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTRYWIDE HOME LOANS; BAC HOME LOANS SERVICING, LP, A SUBSIDIARY OF BANK OF AMERICA, N.A.; AMERICAHOMEKEY; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; US FUNDING GROUP, INC.; JOHN MORRIS; and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. 2:09-CV-01593-WBS-KJM <br><br> **REQUEST FOR JUDICAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT AND TO STRIKE REQUEST FOR PUNITVE DAMAGES** <br><br> [Filed concurrently with Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)6 or in the Alternative Motion to Strike Pursuant to Fed.R.Civ.P. 12(f); Request for Judicial Notice; [Proposed] order <br><br> Date:        December 7, 2009 <br> Time:        2:00 p.m. <br> Courtroom:   5, 14 Floor <br> 501 "I" Street, 4-200 <br> Sacramento, CA 95814 <br><br> Judge:  The Honorable William B. Shubb |

1

REQUEST FOR JUDICAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S
COMPLAINT AND TO STRIKE RQUEST FOR PUNITVE DAMAGES

96797

1  **TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that on December 7, 2009 at 2:00 p.m., or as soon thereafter

3  as counsel may be heard in Department 5 of the above-entitled Court, located at 501 "I" Street,

4  Sacramento, California 95814, Defendant AMERICAHOMEKEY, INC. will, and hereby does,

5  move this Court, the Honorable Garland E. Burrell, Jr. presiding, to take judicial notice of the

6  documents attached to this Request for Judicial Notice ("RJN") as Exhibit A-F.

7      Exhibit A:  "Adjustable Rate Notice," referenced by Plaintiff WILLIAM BARDIN

8  ("BARDIN") in his First Amended Complaint ("FAC") at Paragraphs 10, 11, 20, 30, 33, 35, 36,

9  43, 44, 99, dated January 4, 2006 and signed by Plaintiff BARDIN.

10     Exhibit B:  Deed of Trust, including "Adjustable Rate Rider," referenced by Plaintiff

11  BARDIN in his FAC at Paragraphs 9, 10, 20, 30, 31, 33, 35, 36, 37, 44, 99, recorded in the

12  Sacramento County Official Records, Document No. 200600111, On January 11, 2006, at 2:29

13  p.m., and signed and acknowledged by Plaintiff BARDIN on January 6, 2006.

14     Exhibit C:  "Adjustable Rate Mortgage Loan Program Disclosure," dated and signed by

15  Plaintiff BARDIN on January 6, 2006.

16     Exhibit D:  "Truth In Lending Disclosure Statement," referenced by Plaintiff BARDIN in

17  his FAC at Paragraphs 38, 39, 50 and 57, dated, signed, and acknowledged by Plaintiff

18  BARDIN on January 6, 2006.

19     Exhibit E:  "Notice of Right to Cancel," referenced by Plaintiff in his FAC at Paragraphs

20  28, 50, 51 and 52 dated, signed, and acknowledged by Plaintiff on January 6, 2006.

21     Exhibit F:  "First Amended Complaint" filed on September 11, 2009 in Judge Garland E.

22  Burrell, Jr.'s Department, court  case number 2:09-CV-01592-GEB-KJM together with a docket sheet

23  showing the date that it was filed.

24  / / /

25  / / /

26  / / /

27

28

REQUEST FOR JUDICAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S
COMPLAINT AND TO STRIKE RQUEST FOR PUNITVE DAMAGES

96797

1    This RJN is based on the attached Memorandum of Points and Authorities, all pleadings

2    and papers on file in this action, and such other and further matters as the Court may consider.

3                                        Respectfully submitted,

4                                        **MICHELMAN & ROBINSON, LLP**

5

6    Dated:  October 8, 2009          By:      /s/  Jeffrey D. Farrow
                                              JEFFREY D. FARROW, ESQ.
7                                             Attorneys for Defendant AMERICAHOMEKEY, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S
COMPLAINT AND TO STRIKE RQUEST FOR PUNITVE DAMAGES

96797

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION.

Defendants request that the Court take judicial notice, pursuant to Federal Rule of Evidence 201, of the attached documents ("Exhibits"). Plaintiff BARDIN references Exhibits A-E- but does not attach – these Exhibits throughout his FAC. Moreover, Exhibits A-E relate to the placement and foreclosure of Plaintiff's mortgage and Exhibit F relates to a previous First Amended Complaint concerning identical issues and facts which was been previously filed in a different Federal case.

In the FAC, Plaintiff seeks various remedies, including damages, rescission, and injunctions against Defendants for alleged improprieties in connection with a loan transaction.

### II.  JUDICIAL NOTICE IS PROPER.

Defendant AMERICA HOMEKEY, INC. ("AH") request the Court to consider the attached Exhibit A-E, because they are referenced in Plaintiff BARDIN's FAC (*see, e.g., FAC ¶* 9, 10, 11, 20, 28, 30, 31, 33, 35, 36, 37, 38, 39, 43, 44, 50, 51, 52 and 99) and Exhibit F since it was filed in a different matter relating to the exact transactions and issues outlined in the FAC. Defendant AH also requests that the Court take judicial notice of the attached Exhibits A-E on the basis that they are central to the resolution of Plaintiff BARDIN's FAC and, in part, bear Plaintiff BARDIN's signature or were recorded in the Sacramento County Official Records.

Under Federal Rule of Evidence 201, a fact is judicially noticeable when it is not subject to reasonable dispute and is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Documents not physically attached to the Complaint may be considered by the Court on Rule 12(b)(6) Motion if the Complaint refers to the documents, the documents are central to Plaintiff's claims, and there is no question concerning the authenticity of the documents. *See Branch v. Tunnell*, 14 F..3d 449, 454 (9th Cir. 1994). The Court's consideration of the attached loan disclosures and loan documents does not convert Defendant AH's Rule 12(b)(6) Motion into a motion for summary judgment. *Branch v.*

1

REQUEST FOR JUDICAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S
COMPLAINT AND TO STRIKE RQUEST FOR PUNITVE DAMAGES

96797

1 *Tunnell, supra;* Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2005,
2 9:212.1b).

3      The conditions for taking judicial notice of the Exhibits in connection with Defendants'
4 Motion to Dismiss are met here:  (1) they are referenced throughout the FAC (*see, e.g.,* FAC ¶¶
5 9, 10, 11, 20, 28, 30, 31, 33, 35, 36, 37, 38, 39, 43, 44, 50, 51, 52 and 99) or are identical facts
6 filed in a different case; (2) they are central to Plaintiff BARDIN's claims against Defendants;
7 (3) they are capable of accurate and ready determination by resort to sources whose accuracy
8 cannot reasonable be questioned; and (4) there is no material question concerning their
9 authenticity as either Plaintiff BARDIN's signatures are part of the documents or they were
10 recorded in the Sacramento County Official Records.

11 **III.    CONCLUSION.**

12      For the foregoing reasons, Defendant AH respectively request the Court take judicial
13 notice of the attached Exhibits.

14                                        Respectfully submitted,

15

16                              **MICHELMAN & ROBINSON, LLP**

17

   Dated: October 8, 2009          By:      /s/  Jeffrey D. Farrow
18                                        JEFFREY D. FARROW, ESQ.
                                         Attorney for Defendant AMERICAHOMEKEY, INC.
19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S
COMPLAINT AND TO STRIKE RQUEST FOR PUNITVE DAMAGES

96797

# EXHIBIT A

MIN: 100098500040204950

Loan Number: 4020495

# ADJUSTABLE RATE NOTE
(MTA-Twelve Month Average Index – Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

JANUARY 4, 2006           SACRAMENTO              CALIFORNIA
[Date]                      [City]                   [State]

4525 MCDONALD DRIVE,  SACRAMENTO,  CALIFORNIA  95821
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $304,000.00     (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT       ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is AMERICAHOMEKEY, INC., A TEXAS CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
**(A)  Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.500 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Rate Change Dates**
The interest rate I will pay may change on the     1st     day of MARCH,  2006     , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)  Index**
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 575/1000         percentage point(s)   2.575 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950  %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**
**(A)  Time and Place of Payments**
I will make a payment every month.
I will make my monthly payments on the     1st     day of each month beginning on MARCH 1,  2006. I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on FEBRUARY 1,  2036  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at P.O. BOX 191708, DALLAS, TEXAS 75219

or at a different place if required by the Note Holder.

Borrower Initials: _A.D.B._  ____  ____  ____
PayOption ARM Note – MTA Index
FE-5312 (0511)                              Page 1 of 4

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$1,049.17          unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the  1st
day of  MARCH, 2007    , and on that day every 12th month thereafter. Each
of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F)
or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount
the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as
provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the
interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or
as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the
monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment
Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the
month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless
Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will
not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap."
This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments
Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the
amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below
requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and
the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly
payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less
than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay
the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal
payments. For each month that my monthly payment is less than the interest portion, the Note Holder will
subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to
my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by
Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will
apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to  115.000  percent of the Principal
amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments
and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to
exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change
more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new
Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the
Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the     5th       Payment Change Date and on each succeeding fifth Payment Change Date
thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes
again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment
options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the
following Payment Options:
  (i)     Interest Only Payment: the amount that would pay the interest portion of the monthly payment
at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is
only available if the interest portion exceeds the Minimum Payment.
  (ii)    Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at
the Maturity Date in substantially equal payments.
  (iii)   15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest)
within a fifteen (15) year term from the first payment due date in substantially equal payments. This
monthly payment amount is calculated on the assumption that the current rate will remain in effect for
the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

Borrower Initials _____ _____ _____ _____ _____
PayOption ARM Note - MTA Index
FE-5312 (0511)                                  Page 2 of 4



**4.    NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY    ** See attached Prepayment Note Addendum.**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**
    **(A)  Late Charges for Overdue Payments**
    If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

    **(B)  Default**
    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C)  Notice of Default**
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D)  No Waiver By Note Holder**
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)  Payment of Note Holder's Costs and Expenses**
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

Borrower Initials: _____ _____ _____ _____

PayOption ARM Note - MTA Index
FE-5312 (0511)                                    Page 3 of 4

10. **WAIVERS**
   I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **SECURED NOTE**
   In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

   Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_William D. Bardin_ _____ (Seal)
WILLIAM D BARDIN                                        -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

DATE: JANUARY 4, 2006
BORROWER:    WILLIAM D BARDIN

LOAN #:  4020495
PROPERTY ADDRESS:    4525 MCDONALD DRIVE
SACRAMENTO, CALIFORNIA 95821
MIN: 100098500040204950

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated JANUARY 4, 2006    , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by AMERICAHOMEKEY, INC, A TEXAS CORPORATION
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first    THIRTY-SIX    months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment. I will pay this Prepayment Penalty regardless of whether I sell the Property or refinance the loan with the same Lender or Note Holder.

All other terms and conditions of the above referenced Note remain in full force and effect.

_____
WILLIAM D BARDIN                                    Borrower

_____
                                                   Borrower

_____
                                                   Borrower

_____
                                                   Borrower

Multistate Prepayment Penalty Addendum – (H-PPP)
FE-5201 (0412)

## Note Allonge

Borrower:    WILLIAM D BARDIN
             4525 MCDONALD DRIVE
             SACRAMENTO, CA 95821

Amount:      $304,000.00

Note Date:   JANUARY 4, 2006

Loan Number: 4020495

PAY TO THE ORDER OF

COUNTRYWIDE BANK, N.A.
WITHOUT RECOURSE
AMERICAHOMEKEY, INC.

_____

Kathy Shadle, Sr. Vice President

# EXHIBIT B

PLACER TITLE COMPANY

Recording Requested By:
AMERICAHOMEKEY, INC

And After Recording Return To:
AMERICAHOMEKEY, INC
3131 MCKINNEY AVE #400
DALLAS, TEXAS 75204
Loan Number: 4020495

Sacramento County Recording
Craig A Kramer, Clerk/Recorder
BOOK **20060111** PAGE **1276**
Check Number 9081
Wednesday, JAN 11, 2006  2:29:35 PM
Ttl Pd   $55.00       Nbr-0004081368

TJH/12/1-20

009500163    BARDIN    WD

610   116754347    D2    001    002

[Space Above This Line For

## DEED OF TRUST

MIN: 100098500040204950

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 4, 2006                , together with all Riders to this document.
(B) "Borrower" is WILLIAM D BARDIN, A MARRIED MAN


Borrower is the trustor under this Security Instrument.
(C) "Lender" is AMERICAHOMEKEY, INC

Lender is a TEXAS CORPORATION                                                   organized
and existing under the laws of TEXAS
Lender's address is 3131 MCKINNEY AVE #400, DALLAS, TEXAS 75204


(D) "Trustee" is PLACER TITLE COMPANY
455 WATT AVENUE, SACRAMENTO, CALIFORNIA 95864

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated JANUARY 4, 2006
The Note states that Borrower owes LenderTHREE HUNDRED FOUR THOUSAND AND 00/100
                                        Dollars (U.S. $ 304,000.00        ) plus interest.

Borrower Initials:

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than FEBRUARY 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of          SACRAMENTO

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

Borrower Initials _R.D.D.S._

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01

Page 2 of 14

DocMagic eForms 800-649-1362
www.docmagic.com

SEE ATTACHED EXHIBIT "A" MADE A PART HERE OF FOR COMPLETE LEGAL DESCRIPTION.
A.P.N. #: 271-0051-032

which currently has the address of   4525 MCDONALD DRIVE
                                                          [Street]

SACRAMENTO                               , California   95821        ("Property Address"):
        [City]                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

Borrower Initials: _____   _____   _____   _____   _____

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

Borrower Initials: _____

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Borrower Initials: _____  _____  _____  _____  _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 5 of 14                         DocMagic eForms 800-649-1362
                                                                                        www.docmagic.com

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Borrower Initials: _RDB_   _____   _____   _____

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

Borrower Initials: _C.D.D._ ____ ____ ____ ____ ____

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower Initials: _____  _____  _____

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

Borrower Initials: _WDM_ _____ _____ _____ _____ _____

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

Borrower Initials: _W̶D̶D̶_ _____  _____  _____

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The

Borrower Initials: _____ _____ _____ _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                         Page 11 of 14                                         DocMagic eForms 800-649-1362
www.docmagic.com

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Borrower Initials: _____  _____  _____  _____  _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic eForms 800-649-1362
Form 3005 01/01                              Page 12 of 14                              www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_William D. Bardin_ (Seal)
WILLIAM D BARDIN      -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Witness:                                    Witness:

_____          _____

State of California San Joaquin^8th  ) ss.
County of ~~SACRAMENTO~~  )

On ~~Oct~~ 1-6-06 before me,  J. Tennies

personally appeared  WILLIAM D BARDIN

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

J. TENNIES
COMM. #1450524
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
MY COMM. EXPIRES NOV. 11, 2007

NOTARY SEAL

_____
NOTARY SIGNATURE

J. Tennies
_____
(Typed Name of Notary)

402-22563

## EXHIBIT "A"

THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SACRAMENTO, UNINCORPORATED AREA, AND IS DESCRIBED AS FOLLOWS:

LOT 141, AS SHOWN ON THE OFFICIAL "PLAT OF PARKLAND ESTATES UNIT NO. 2", RECORDED IN BOOK 31 OF MAPS, MAP NO. 5, RECORDS OF SAID COUNTY.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF INTEREST IN ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS IN AND UNDER SAID LAND BUT NOT INCLUDING THE USE OR OCCUPANCY OF THE SURFACE AND DOWN TO A DEPTH OF NOT MORE THAN 50 FEET, EXCEPT THAT NOTHING SHALL PREVENT, HINDER OR DELAY DRILLING OPERATIONS UNDER THE SURFACE OF THE LAND, AS CONTAINED IN THE DEED FROM BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION TO L. T. BLACKWELL AND WIFE, DATED JULY 17, 1939, RECORDED JULY 27, 1939 IN BOOK 764 OF OFFICIAL RECORDS, PAGE 232, AND AS MODIFIED BY A QUITCLAIM DEED FROM CAPITAL COMPANY TO JOHN FERNANDEZ AND WIFE, DATED SEPTEMBER 12, 1949, RECORDED SEPTEMBER 21, 1949 IN BOOK 1699 OF OFFICIAL RECORDS, PAGE 488.

APN:271-0051-032

D:\Legal.doc (7/2002)

MIN: 100098500040204950                          Loan Number: 4020495
Doc ID#:

## ADJUSTABLE RATE RIDER

### (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this      4th          day of JANUARY
2006            , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICAHOMEKEY, INC, A TEXAS CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and
located at:
          4525 MCDONALD DRIVE, SACRAMENTO, CALIFORNIA 95821
                          [Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.   INTEREST
     (A)  Interest Rate
     Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of    1.500 %.  The interest rate I will pay may change.
     The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

     (B)  Interest Rate Change Dates
     The interest rate I will pay may change on the      1st          day of MARCH
2006        , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

Borrower Initials: _____ _____  _____  _____  _____  _____

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 1 of 5

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 575/1000 percentage point(s) 2.575 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than 9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on MARCH 1, 2006 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Interest before Principal. If, on FEBRUARY 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 191708, DALLAS, TEXAS 75219

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,049.17 unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of MARCH, 2007 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the Interest due then negative amortization will occur.

Borrower Initials: ~~CDH~~

PayOption MTA ARM Rider
FE-5315 (0511)                          Page 2 of 5

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E)  Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

(F)  Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000 percent ( 115.000 %)of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G)  Required Full Payment

On the    5th       Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

PayOption MTA ARM Rider
FE-5315 (0511)                                    Page 3 of 5

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)     Interest Only Payment:   the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)   15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Borrower Initials: _____ _____ _____ _____
PayOption MTA ARM Rider
FE-5315 (0511)                          Page 4 of 5

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_William D Bardin_ _____ -Borrower
WILLIAM D BARDIN

_____ -Borrower

_____ -Borrower

_____ -Borrower

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 5 of 5

# EXHIBIT C

DATE: JANUARY 4, 2006
BORROWER: WILLIAM D BARDIN
CASE #:
LOAN #: 4020495
PROPERTY ADDRESS: 4525 MCDONALD DRIVE, SACRAMENTO, CALIFORNIA 95821

## ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
## MONTHLY TREASURY AVERAGE INDEX - PAYMENT CAPS
### ALL STATES EXCEPT NEW YORK

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

| HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED | | |
|---|---|---|
| <ul><li>Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin.</li><li>The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.</li><li>Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts.</li><li>For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below.</li></ul> | | |
| | MTA ARM (Initial rate change at 1 month) | MTA ARM (Initial rate change at 3 months) |
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | <ul><li>Your interest rate will be rounded to the nearest 1/8%.</li><li>Your interest rate will never exceed the maximum set forth in your loan documents.</li></ul>The maximum rate in effect as of the first business day of January 2005 is 9.95%. Please ask us for our current maximum rate. | |
| How Your Payment Can Change | | |
| Your payment can change: | <ul><li>Every year and can increase or decrease substantially based on changes in the interest rate.</li><li>At the 5th or 10th Payment Change Date (depending on the loan program you select), and on every 5th Payment Change Date after that, the Minimum Payment will be the Full Payment until the next Payment Change Date.</li></ul> | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date. This payment is called the "Full Payment." Except as otherwise provided, your "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap"). Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment. You also have the option to pay the Full Payment for your monthly payment. If you pay less than the Full Payment, then the payment may not be enough to cover the interest due, and any difference will be added to your principal balance. **This means the balance of your loan could increase. This is known as "negative amortization."** During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options"). Please ask us about these Payment Options. | |
| The unpaid principal of your loan: | Can never exceed 115% (110% in New York) of the original amount borrowed. This means that your monthly payment may change more frequently than annually and the payment change will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to pay off the unpaid principal balance over the remaining life of the loan at the current interest rate. | |
| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect for a 30 year loan on the first business day of January 2005, and assume the maximum periodic increases in rates and payments. This program may also be available with a 40 year term. | |
| Examples of loans with a discounted interest rate (below sum of index and margin) | | |
| Initial Interest Rate | 1.00% | 1.75% |
| Maximum Interest Rate | 9.95% | 9.95% |
| First Year Payment | $32.16 | $35.72 |
| Maximum payment | $101.46 in the 3rd year | $102.14 in the 3rd year |

ARM MTA PayOption Disclosure
FE-4273 (0511)

| | Examples of loans with a premium interest rate (above sum-of index and margin) | |
|---|---|---|
| Initial Interest Rate | N/A | N/A |
| Maximum Interest Rate | N/A | N/A |
| First Year Payment | N/A | N/A |
| Maximum payment | N/A | N/A |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a 30 year $60,000 MTA ARM Index – Payment Cap loan with a discounted interest rate would be: $60,000 / $10,000 = 6; 6 x $32.16 = $192.96 per month)

_William D Bardin_    1/6/06
Applicant WILLIAM D BARDIN      Date

_____    _____
Applicant                       Date

_____    _____
Applicant                       Date

_____    _____
Applicant                       Date

# EXHIBIT D

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Date: JANUARY 4, 2006

Loan Number: 4020495
Creditor: AMERICAHOMEKEY, INC
Address: 3131 MCKINNEY AVE #400, DALLAS, TEXAS 75204

Borrower(s): WILLIAM D BARDIN

Address: 4525 MCDONALD DRIVE, SACRAMENTO, CALIFORNIA 95821

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 6.424 % | $427,091.69 | $296,597.06 | $723,688.75 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning | Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning | Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning |
|---|---|---|---|---|---|---|---|---|
| 1 | 1,049.17 | 03/01/06 | | | | | | |
| 11 | 1,049.17 | 04/01/06 | | | | | | |
| 12 | 1,127.86 | 03/01/07 | | | | | | |
| 12 | 1,212.45 | 03/01/08 | | | | | | |
| 12 | 1,303.38 | 03/01/09 | | | | | | |
| 12 | 1,401.13 | 03/01/10 | | | | | | |
| 299 | 2,168.53 | 03/01/11 | | | | | | |
| 1 | 2,170.40 | 02/01/36 | | | | | | |

____ DEMAND FEATURE: This obligation has a demand feature.

_X_ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:
____ Credit life insurance and credit disability _X_ Property Insurance ____ Flood Insurance ____ Private Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.

SECURITY: You are giving a security interest in: 4525 MCDONALD DRIVE, SACRAMENTO, CALIFORNIA 95821
____ The goods or property being purchased _X_ Real property you already own.

FILING FEES: $150.00

LATE CHARGE: If payment is more than ____15____ days late, you will be charged ___5.000_ % of the payment. * or $5.00 (whichever is greater)

PREPAYMENT: If you pay off early, you
_X_ may ____ will not have to pay a penalty.
____ may _X_ will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property ____ may _X_ may, subject to conditions ____ may not assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

_X_ "e" means an estimate ____ all dates and numerical disclosures except the late payment disclosures are estimates.

Each of the undersigned acknowledge receipt of a complete copy of this disclosure. The disclosure does not constitute a contract or a commitment to lend.

Applicant WILLIAM D BARDIN _____ Date 1/4/06        Applicant _____ Date

Applicant _____ Date        Applicant _____ Date

Applicant _____ Date        Applicant _____ Date

** NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

DocMagic eFormS 800-649-1362
www.docmagic.com

# EXHIBIT E

# NOTICE OF RIGHT TO CANCEL

Loan Number: 4020495

Borrowers: WILLIAM D BARDIN

Property Address: 4525 MCDONALD DRIVE, SACRAMENTO, CALIFORNIA 95821

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is  JANUARY 4, 2006  ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
AMERICAHOMEKEY, INC
3131 MCKINNEY AVE #400
DALLAS, TEXAS 75204

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JANUARY 7, 2006  (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

---

Consumer's Signature                              Date
WILLIAM D BARDIN

---

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_William D Bardin_                    1/6/06
WILLIAM D BARDIN                      Date

---

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
05/06/05

DocMagic *DocMagic* 800-649-1362
www.docmagic.com

# PROOF OF SERVICE

### Case Name: Bardin v. Bank of America, et al.
### USDC (Eastern District) Case No.: 2:09-CV-01592-GEB-KJM

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen and not a party to the within action. I am employed in the County of Orange, State of California. My business address is 4 Hutton Centre Dr., Suite 300, Santa Ana, California 92707.

On September 28, 2009, I served the foregoing document described as REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT AND TO STRIKE REQUEST FOR PUNITIVE DAMAGES   on all interested parties in this action as follows:

## SEE ATTACHED SERVICE LIST

(X)    BY CM/ECF for parties that are CM/ECF participants. Service is being made electronically on those parties on the attached list that are registered users of the Court's Electronic Case Filing System.

(X)    BY U.S. MAIL for parties that are not CM/ECF participants.  I caused such envelope to be deposited in the mail at Santa Ana, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

(X)    (FEDERAL)  I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2009 at Santa Ana, California.

Henrietta McCarthy

1

## SERVICE LIST

### Service by Electronic Case Filing System:

**Michael J.M. Brook, Esq.**
Lanahan and Reilley LLP
600 Bicentennial Way, Ste. 300
Santa Rosa, CA 9540308-286-8932
T: 707-524-4200
F: 707-523-4610
*Email: mbrook@lanahan.com*
Attorney for Plaintiff, WILLIAM D. BARDIN


**Robert Alan Padway, Esq.**
Bryan Cave LLP
2 Embarcadero Center, Ste. 1410
San Francisco, CA 94111
T: 415-675-3428
F: 415-675-3434
*Email: robertpadway@bryancave.com*
Attorney for Defendant, BANK OF AMERICA


**Robert Alan Padway, Esq.**
Bryan Cave LLP
2 Embarcadero Center, Ste. 1410
San Francisco, CA 94111
T: 415-675-3428
F: 415-675-3434
*Email: robertpadway@bryancave.com*
Attorney for Defendant, MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

2

# EXHIBIT "E"

LANAHAN & REILLEY
MICHAEL J.M. BROOK SBN 139595
600 BICENTENNIAL DR STE 300
SANTA ROSA CA 95403
(707) 524-4200; FAX (707) 523-4610
email: mbrook@lanahan.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM D. BARDIN | CASE NO. 2:09-CV-01592-GEB-KJM |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR: |
| v. | |
| COUNTRYWIDE HOME LOANS; AMERICAHOMEKEY, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; US FUNDING GROUP, INC.; RAYMOND A. BOWDEN; JOHN MORRIS and DOES 1-20 inclusive, | 1. VIOLATION OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1601 et seq.)<br>2. VIOLATION OF CALIFORNIA ROSENTHAL ACT<br>3. NEGLIGENCE<br>4. VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT (12 U.S.C. § 2605 et seq.) |
| Defendants. / | 5. BREACH OF FIDUCIARY DUTY<br>6. FRAUD<br>7. VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 et seq.<br>8. BREACH OF CONTRACT<br>9. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING |
| | DEMAND FOR JURY TRIAL |

1

FIRST AMENDED COMPLAINT

Plaintiff William D. Bardin ("Plaintiff"), by and through his counsel, for his First Amended Complaint against Defendants Countrywide Home Loans ("CHL"), Americahomekey, Inc., ("AH"), Mortgage Electronic Registration Systems, Inc. ('MERS"), US Funding Group, Inc. ("UFG"), Raymond A. Bowden ("Bowden"), and John Morris ("Morris")(collectively "Defendants"), pleads as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction based on federal question under 28 U.S.C. §§ 1331 and 1367, 18 U.S.C. § 1964(c) and 15 U.S.C. § 1640(e). This is an action asserting violations of federal statutes commonly known as the Truth In Lending Act ("TILA") (15 U.S.C. 1601 et seq.), the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. 2601 et seq.) and its implementing regulations, 12 C.F.R. Part 226, et seq. ("Regulation Z"), with additional claims under California state law. These claims all arise out of the same controversy and sequence of events.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claim occurred in this judicial district.

3. This Court has personal jurisdiction over the parties as all Defendants engage in business within the State of California and the Eastern District and thus have sufficient contacts.

4. Jurisdiction of this Court for the pendent state claims is authorized by Federal Rule of Civil Procedure 18(a).

5. Defendants, and each of them, regularly engage in business in the State of California and regularly provide mortgage loans and related services to residents in the State of California who wish to obtain a mortgage loan, and who contact or are contacted by a loan officer for assistance in obtaining the necessary financing.

6. Plaintiff brings this action against Defendants for damages and harm resulting from the Defendants' negligent, fraudulent and unlawful conduct concerning a residential mortgage loan transaction with the Plaintiff. The residential mortgage concerned the property located at 4525 McDonald Drive, Sacramento, County of Sacramento, State of California.

2

FIRST AMENDED COMPLAINT

**PARTIES**

7.     The residential property, subject to this First Amended Complaint, is located at 4525 McDonald Drive, Sacramento, County of Sacramento, State of California ("Property").

8.     Plaintiff is informed and believes, and thereon alleges that at all times mentioned in this First Amended Complaint, Defendants CHL, AH, and MERS, are diversified financial marketing and/or services corporations engaged primarily in residential mortgage banking and/or related businesses.

9.     Plaintiff is informed and believes, and thereon alleges that MERS is a Delaware corporation engaged in the business of holding title to mortgages.  It does business in California as evidenced by inclusion of its name on the Deed of Trust.  MERS was not registered to do business in California, and its agent for service of process resigned March 25, 2009.  The Deed of Trust in this case states:

> "The beneficiary of this security instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This security instrument secures to Lender (i) repayment of the Loan and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and Note.  For this purpose, the Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale the following described property.

10.     Plaintiff is informed and believes, and thereon alleges that MERS' conduct, with respect to the Promissory Note and the Deed of Trust in this case, is governed by "MERS Terms and Conditions" applicable to Defendants which state that:

> "MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law."

3

FIRST AMENDED COMPLAINT

11.    As a result of said express conditions, and pursuant to California Commercial Code §§ 1201(21), 3301, and 3309, MERS has no beneficial interest or right to enforce the terms of the Promissory Note, because it is not in possession of the Promissory Note, and has no authority to conduct a non-judicial foreclosure sale.

12.    Plaintiff is informed and believes, and thereon alleges that at all times mentioned in this First Amended Complaint, Defendants UFG, Bowden, and Morris sold Plaintiff the mortgage involved herein.

13.    Plaintiff is informed and believes, and thereon alleges that at all times mentioned in this First Amended Complaint, Defendant Morris was the loan officer who sold Plaintiff the mortgage at issue. Defendant Morris held himself out to Plaintiff as a loan officer employed by Defendant UFG was acting within the course and scope of that employment when he came into contact with Plaintiff and sold Plaintiff the mortgage at issue. Though Defendant Morris held himself out to be a loan officer, there is no record of him ever being licensed by the California Department of Real Estate.

14.    Plaintiff is informed and believes, and thereon alleges that at all times mentioned in this First Amended Complaint, Defendant Bowden was a real estate Broker licensed by the State of California Department of Real Estate, and the Broker of record for Defendant UFG

15.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein under the fictitious names Does 1 through 20, inclusive, and Plaintiff will amend this First Amended Complaint to allege such names and capacities as soon as they are ascertained. Plaintiff is informed and believes, and thereon alleges that each of said fictitiously named Defendants are responsible in some manner for the wrongful acts complained of herein.

16.    Plaintiff is informed and believes, and thereon alleges that Defendants, and each of them, at all relevant times herein were and still are agents for one another, and acting under the course and scope thereof, with knowledge and consent of each other.

/ /

/ /

FIRST AMENDED COMPLAINT

**GENERAL ALLEGATIONS**

17.    This action arises out of a loan related activity to the Property of which the Plaintiff is the rightful owner.

18.    Plaintiff is informed and believes, and thereon alleges that beginning in 1998, and such facts are so well known as to be Judicially Noticeable under Federal Rule of Evidence 201 and California Evidence Code §§ 451 and 452, lenders, their agents, employees, and related servicers, including Defendants, developed a scheme to rapidly infuse capital into the home mortgage lending system by selling mortgages on the secondary market, normally three to five times, to create a bankruptcy remote transaction. The lenders, their agents, employees, and related servicers, including Defendants, then pooled these mortgages into large trusts, securitizing the pool and selling these securities on Wall Street as mortgage backed securities, bonds, derivatives and insurances, often for twenty or thirty times the original mortgage.

19.    Plaintiff is informed and believes, and thereon alleges that in "selling" these mortgage notes on the secondary market, Defendants failed to follow the basic legal requirements for the transfer of a negotiable instrument and an interest in real property.  While lenders could have simply gone to Congress to amend existing law so that it would allow for their envisioned transfers, they did not.  Instead the Defendants simply ignored the legal requirements.

20.    Plaintiff is informed and believes, and thereon alleges that in fact, no interest in the Mortgage Note, Deed of Trust or Property was ever legally transferred to any of the Defendants, and that the Defendants are in effect straw men, and parties without any standing before this Court to assert legal rights with respect to this contractual transaction.

21.    Further, Plaintiff is informed and believes, and thereon alleges that as this process became more and more profitable, the underwriting requirements were repeatedly reduced to ensure more and more unsuspecting borrowers.  As the lenders reduced the underwriting requirements, they introduced the concept of "churning" loans involving a calculated plan to repeatedly refinance borrowers' loans, taking as much equity as possible, and artificially driving up housing prices.

5

FIRST AMENDED COMPLAINT

1    22.    Plaintiff is informed and believes, and thereon alleges that lenders, Defendant AH

2    included, regularly trained, directed, authorized and/or participated with mortgage brokers to

3    implement this scheme, giving them monetary incentives to violate the borrowers' trust.

4    23.    On or about October 04, 2005, Defendant Morris approached Plaintiff telling him

5    that he was the loan officer for Defendant UFG solicited him to refinance his residence.

6    24.    Defendant Morris advised Plaintiff that he could get him the "best deal" and the

7    "best interest rates" available on the market. Defendant Morris knew or should have known that

8    these assurances were false and misleading.

9    25.    When Plaintiff applied for this loan, he accurately described his income and

10   provided Defendant Morris with documentation of his income including tax returns, bank

11   statements and W-2s. Plaintiff is now informed and believes, and thereon alleges that his income

12   was over stated on the loan application by Defendant Morris, without his knowledge or

13   permission. Defendant Morris overstated Plaintiff's income in the amount of $2,900.00. Plaintiff

14   is informed and believes, and thereon alleges that Defendant underwriters knew or should have

15   known of the fraudulent information on the loan application but approved the loan anyway.

16   26.    Defendant Morris further advised Plaintiffs that he could get them 100% financing

17   for their residence, and the only loan program available for him was an option arm. Defendant

18   Morris sold Plaintiff a loan at 3% interest with an adjustable rate with an index based on a 12

19   month average of the monthly average yields.

20   27.    Defendant Morris further advised Plaintiff that if the loan ever became

21   unaffordable, he would simply refinance it into an affordable loan, something Defendant Morris

22   knew or should have known was false and misleading. Defendant Morris knew or should have

23   known that these misrepresentations were designed to induce Plaintiff to accept this loan to his

24   detriment.

25   28.    Plaintiff was not given a copy of any of the loan documents prior to closing as

26   required. At closing, Plaintiff was only given a few minutes to sign the documents. The notary

27   did not explain any of the loan documents nor was Plaintiff allowed to review them. Plaintiff was

28

1  simply told to sign and initial the documents provided by the notary. Further, Plaintiff did not

2  receive the required copies of a proper notice of cancellation.

3      29.    The facts surrounding this loan transaction were purposefully hidden to prevent

4  Plaintiff from discovering the true nature of the transaction and the documents involved therein.

5  Facts surrounding this transaction continue to be hidden from the Plaintiff to this day.

6      30.    On or about January 4, 2006, Plaintiff completed the loan on the Property. The

7  terms of the loan were memorialized in a Promissory Note, which was secured by a Deed of Trust

8  on the Property. The Deed of Trust identified Placer Title Company as Trustee, and Defendant

9  AH as Lender.

10      31.    The Deed of Trust also identified MERS as nominee for the Lender and Lender's

11  successors and assigns, and the beneficiary. Plaintiff is informed and believes, and thereon

12  alleges that MERS has no standing in this forum. It is not licensed to be and/or act as a nominee

13  or a beneficiary of any of the Defendants, nor does its Terms and Conditions, enumerated above,

14  permit MERS to act in such capacity. MERS was developed to be a document storage company,

15  not a nominee or a beneficiary of any of the Defendants. Therefore, the Deed of Trust must fail.

16  Further, Plaintiff is informed and believes, and thereon alleges that MERS was not licensed to do

17  business in the State of California, and was not registered with the State of California at the

18  inception of the loan involved herein.

19      32.    On or about March 31, 2009 and May 11, 2009, a Qualified Written Request under

20  RESPA ("QWR" or "Request") was mailed to Defendant CHL. The QWR included a demand to

21  rescind the loan under the TILA provisions. Defendant CHL has yet to properly respond to this

22  Request.

23      33.    On information and belief, Plaintiff alleges that each of the Defendants is not a

24  "person entitled to enforce" the security interest under the Note and the Deed of Trust, as defined

25  in California Commercial Code § 3301. Plaintiff alleges that Defendants sold home loans,

26  Plaintiff's home loan included, to other financial entities, which "pooled" large numbers of loans,

27  put them into trusts, and sold securities based on such loans. Plaintiff alleges that Defendants do

28

7

FIRST AMENDED COMPLAINT

1   not own the loan subject to this action, and are not entitled to enforce the security interest.

2       34.     On information and belief, Plaintiff alleges that Defendants regularly approved
3   loans to unqualified borrowers and implemented unlawful lending practices.  Further, Plaintiff
4   alleges that Defendant AH employed brokers and loan officers who were paid commissions based
5   on the volume of loans they sold to consumers, Plaintiff included.  Plaintiff alleges that Defendant
6   AH's loan officers received a greater commission or bonus for placing borrowers in loans with
7   relatively high yield spread premiums.  As such, borrowers, Plaintiff included, were steered and
8   encouraged into loans with terms unfavorable to them, or loans which the borrowers, Plaintiff
9   included, were not qualified to obtain.

10      35.     Defendants are attempting to obtain putative legal title to Plaintiff's Property
11  without having established that either of them was ever a "person entitled to enforce" the security
12  interest under the Note and the Deed of Trust.

13      36.     Upon information and belief,  Plaintiff contends that each Defendant, in fact, is not
14  a "person entitled to enforce" said interest.  Upon information and belief,  Plaintiff contends that
15  no legal transfer of the Mortgage Note, Deed of Trust or any other interest in Plaintiff's Property
16  was effected that gave any of the Defendants the right to be named a trustee, mortgagee,
17  beneficiary or an authorized agent of trustee, mortgagee or beneficiary of Plaintiff's Mortgage
18  Note, Deed of Trust or any other interest in Plaintiff's Property.

19      37.     Plaintiff entered into a loan transaction with Defendant AH, which was subject to
20  finance charges, and which was initially payable to Defendant AH under the Deed of Trust.

21      38.     Plaintiff's Loan is subject to TILA provisions and its implementing regulations, 12
22  C.F.R. Part 226 ("Regulation Z").  TILA grants consumers a three-day right to cancel certain types
23  of real estate loan transactions. This three-day right to cancel applies to Plaintiff's Loan with the
24  Defendants.

25      39.     When the loan was consummated, Plaintiff did not receive the required documents
26  and disclosures, including, but not limited to the TILA disclosure, and the required number of
27  copies of the Notice of Right to Cancel stating the date that the rescission period expires.

28

---

FIRST AMENDED COMPLAINT

40.    Under TILA and Regulation Z, Defendants were required to clearly and conspicuously disclose the "amount financed" and the "finance charge," among other things, in connection with the Loan.

41.    Defendants AH and Bowden, as agents of the Lender, were required to provide Plaintiff with said disclosures, but failed to do so.

42.    On information and belief, Plaintiff alleges that in all of the wrongful acts alleged herein, Defendants, and each of them, have utilized the United States mail, telephones and internet in furtherance of their pattern of unlawful and illegal conduct to collect on negotiable instruments when they were not entitled to do so.

43.    Further, Defendants fraudulently added costs and charges to the payoff amount of the Note that were not justified or proper under the terms of the Note or the law.

44.    Defendants represented that they have the right to payment under the Mortgage Note, payment of which was secured by the Deed of Trust.  Whereas in fact, Defendants, and each of them, are not the real parties in interest because they are not the legal trustee, mortgagee or beneficiary, nor are they authorized agents of the trustee, mortgagee or beneficiary, nor are they in possession of the Note, or holders of the Note, or non-holders of the Note entitled to payment, as required by the California Commercial Code §§ 3301 and 3309, and California Civil Code § 2924 et seq.

45.    Due to the conspiratorial nature of the misdeeds alleged herein, and due to Defendants' failure to properly advise Plaintiff regarding the roles and identities of the various entities that were purportedly handling his Loan at any given time, these allegations are generally plead as to all Defendants.

46.    On information and belief, Plaintiff alleges that Defendants misrepresented material facts with the intent of forcing Plaintiff to pay large sums of money to the Defendants, to which they were not entitled, resulting in profit for the Defendants.

47.    The misrepresentations and allegations stated herein were all discovered within the past year, such that any applicable statute of limitations are extended or should be extended

9

FIRST AMENDED COMPLAINT

1  pursuant to the equitable tolling doctrine or other equitable principles.

2                          **FIRST CAUSE OF ACTION**

3                    **VIOLATION OF TRUTH IN LENDING ACT**

4                          **15 U.S.C. § 1601 et seq.**

5                          **(Against Defendant AH)**

6      48.    Plaintiff incorporates here each and every allegation set forth above.

7      49.    The Loan transaction at issue is a consumer credit transaction subject to the

8  provisions of TILA.

9      50.    TILA grants consumers a three-day right to cancel certain residential mortgage

10 loan transactions.  Pursuant to 15 U.S.C. § 1635(a), the three-day cancellation period begins upon

11 the latter of the following events: (1) the "consummation of the transaction"; (2) the "delivery of

12 the information and rescission forms" required by that section; or (3) delivery of accurate

13 "material disclosures" required by TILA.  (15 U.S.C. § 1635(a).)  The "material disclosures" that

14 must be provided to the consumer include accurate disclosure of the annual percentage rate, all

15 finance charges and the amount financed.  (15 U.S.C. § 1602(u).)

16     51.    If the required notice of cancellation is not provided, or if the required "material

17 disclosures" are not delivered, then the right to cancel extends to three years after the date of the

18 loan, or if the facts of the transaction were hidden from the consumer, three years from the date

19 consumer discovered the hidden facts.  (15 U.S.C. § 1635(f).)  If a consumer has the right to

20 rescind against a creditor, the right will also apply to any assignees of that creditor.  (15 U.S.C. §

21 1641(c).)

22     52.    A consumer may exercise their right to cancel a transaction by delivering a written

23 notification of the consumer's intent to rescind to the creditor's place of business.  (12 C.F.R. §

24 226.23(a)(2).)  The consumer's notice to rescind is effective upon mailing.  The notice mailed to

25 the agent servicing the loan is effective notice on the holder of the mortgage.  (12 C.F.R. §

26 226.23(a)(2).)

27     53.    When a consumer rescinds a mortgage transaction, the security interest giving rise

28

FIRST AMENDED COMPLAINT

1   to the right of rescission becomes void and the consumer is not liable for any amount, including

2   any finance or other charge. (15 U.S.C. § 1635(b).)

3         54.    Within twenty (20) days after the receipt of a consumer's election to cancel the

4   transaction, the creditor must return to the consumer all money or property given, including all

5   interest and finance charges paid, and shall take all action necessary or appropriate to reflect the

6   termination of any security interest created under the transaction. (15 U.S.C. § 1635(b); 15 C.F.R.

7   § 226.23(d).)

8         55.    Defendant AH is a "creditor" as that term is defined by 15 U.S.C. §1602.  The

9   transaction between Plaintiff and Defendant AH was a consumer loan transaction wherein

10   Defendant AH extended credit to the Plaintiff, and such credit was secured by an interest

11   purportedly held by Defendant AH in the Property.

12         56.    As a consumer credit transaction, Defendant AH was required to provide Plaintiff

13   with the mandatory TILA disclosure statements and the notice of the Plaintiff's right to rescind,

14   specifying the date on which the three-day rescission period expires.

15         57.    In the course of the transaction described herein, Defendant AH violated TILA in

16   numerous ways, including, but not limited to: (a) failing to provide required disclosures prior to

17   consummation of the transaction; (b) failing to make required disclosures clearly and

18   conspicuously in writing; (c) failing to timely deliver to Plaintiff notices required by TILA; (d)

19   placing terms prohibited by TILA into the transaction; and (e) failing to disclose all finance charge

20   details and the annual percentage rate based upon properly calculated and disclosed finance

21   charges and amounts financed.

22         58.    Records from the transaction indicate that Defendant AH extended credit to

23   Plaintiff without regard to his ability to pay, and falsified requisite income and appraisal

24   information to get the loan approved. Plaintiff is informed and believes, and thereon alleges that

25   Defendant AH has engaged in a pattern and practice of extending credit to consumers, Plaintiff

26   included, under high rate mortgages without regard to the consumers' repayment ability or the

27   actual value of the property.

28

---

11

FIRST AMENDED COMPLAINT

1      59.     Because of these violations, Plaintiff has a continuing right to rescind the loan

2  transaction for up to three years after consummation of the transaction pursuant to 15 U.S.C. §

3  1635(a) and (f) and 15 C.F.R. § 226.23(b)(5). Plaintiff hereby gives notice of rescission by and

4  through this First Amended Complaint.

5      60.     Because of these violations, Defendant AH is liable to the Plaintiff in the amount

6  of twice the finance charge, actual damages to be established at trial, and costs in accordance with

7  15 U.S.C. § 1640(a). Plaintiff is also entitled to the following: rescission of the loan transaction;

8  an order requiring Defendants to take any and all actions necessary to terminate any security

9  interest in the Property, and a declaration by the Court that the security interest is void;

10  expungement of any and all foreclosure instruments, including but not limited, to any Notice of

11  Default or Notice of Trustee's Sale relating to Plaintiff's Property from any public record; removal

12  of any and all derogatory information reported to any and all credit reporting agency or bureau

13  relating to the transaction involved herein; the return to the Plaintiff of any money given by the

14  Plaintiff to any of the Defendants in connection with the Loan transaction; statutory damages;

15  costs and reasonable attorney's fees; and such other relief as the Court may deem just and proper.

16      61.     As a result of Defendant AH's conduct, Plaintiff has suffered and continues to

17  suffer damages in an amount to be proven at trial, which he is entitled to recover.

18      62.     Moreover, Defendant AH's misconduct was done in conscious disregard of

19  Plaintiff's rights, and was willful, malicious, and outrageous. Therefore, punitive damages are

20  warranted and demanded.

21      63.     As a result of Defendant AH's misconduct, the Loan was void and unenforceable

22  at its inception. Therefore, Plaintiff is entitled to rescind the loan agreement and the Promissory

23  Note, and does hereby demand rescission.

24      As a result of Defendant AH's conduct, Plaintiff is entitled to declaratory and injunctive

25  relief preventing Defendant A from taking any action to collect on the loan, and/or to transfer the

26  Property.

27  ///

28

## SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA ROSENTHAL ACT

### CALIFORNIA CIVIL CODE § 1788 et seq.

#### (Against Defendants CHL, AH, and MERS)

64. Plaintiff incorporates here each and every allegation set forth above.

65. Plaintiff alleges that Defendants are debt collectors within the meaning of the Rosenthal Act in that they regularly, in the course of their business, on behalf or themselves or others, engage in the collection of debt.

66. Defendants' actions constitute a violation of the Rosenthal Act in that they threatened to take actions not permitted by law, including but not limited to the following: collecting on a debt not owed to the Defendants, making false reports to credit reporting agencies, falsely stating the amount of a debt, increasing the amount of a debt by including amounts that are not permitted by law or contract, and using unfair and unconscionable means in an attempt to collect a debt.

67. Defendants' actions have caused Plaintiff actual damages, including, but not limited to, severe emotional distress, such as loss of appetite, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness and depression.

68. As a result of Defendants' violations, Plaintiff is entitled to statutory damages in an amount to be determined at trial, actual damages according to proof, and costs and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

#### (Against all Defendants)

69. Plaintiff incorporates here each and every allegation set forth above.

70. Plaintiff is informed and believes, and thereon alleges that Defendants UFG, Bowden and Morris owed a duty to the Plaintiff to perform acts as brokers of loans in such a manner as to not cause Plaintiff harm.

13

FIRST AMENDED COMPLAINT

71.    Defendants UFG, Bowden, and Morris breached their duty to the Plaintiff when they used their knowledge and skill to direct Plaintiff into a loan for which Plaintiff was not qualified based upon his income as stated in the documents provided to Defendants UFG, Bowden, and Morris.

72.    Plaintiff is informed and believes, and thereupon alleges that Defendants UFG, Bowden, and Morris further breached their duty to Plaintiff by directing him into a loan transaction that they may not have otherwise qualified for by industry standards, resulting in excessive fees paid by the Plaintiff and payments in excess of Plaintiff's ability to pay.

73.    Plaintiff is further informed and believes, and thereupon alleges that Defendants CHL, AH, and MERS owed a duty to the Plaintiff to perform acts in such a manner as to not cause Plaintiff harm.  Plaintiff is informed and believes, and thereupon alleges that Defendants breached their duty of care to the Plaintiff when they failed to maintain the original Mortgage Note, failed to properly create original documents, failed to make the required disclosures to the Plaintiff.

74.    Further, Plaintiff is informed and believes, and thereupon alleges that Defendants AH, CHL, and MERS breached their duty of care to the Plaintiff when they took payments to which they were not entitled, charged fees they were not entitled to charge, and made or otherwise authorized negative reporting of Plaintiff's creditworthiness to various credit bureaus wrongfully.

75.    As a result of Defendants' negligence, Plaintiff suffered and continues to suffer harm, and is entitled to damages according to proof and/or other relief as the Court deems just.

### FOURTH CAUSE OF ACTION

### VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT

### 12 U.S.C. § 2605 et seq.

### (Against Defendants CHL and AH)

76.    Plaintiff incorporates here each and every allegation set forth above.

77.    The Loan transaction between Plaintiff and Defendants is a mortgage loan covered by RESPA.

14

FIRST AMENDED COMPLAINT

78.     A violation of RESPA is also made unlawful under California state law by Financial Code § 50505, which states: "[a]ny person who violates any provision of [RESPA] or any regulation promulgated thereunder, violates this division [California Residential Mortgage Lending Act]."

79.     Plaintiff is not certain at this time exactly which of Defendants was actually the servicer of the Loan at any given time.  However, due to the conspiratorial nature of the misdeeds alleged herein, and due to Defendants' failure to properly advise Plaintiff regarding the roles and identities of the various entities that were purportedly handling his Loan at any given time, these allegations are made as to all Defendants.

80.     Defendant AH violated RESPA at the time of the closing of the Loan subject to this First Amended Complaint by failing to correctly and accurately comply with the disclosure requirements provided therein.

81.     Defendant CHL violated RESPA, 12 U.S.C. §2605(e)(2), by failing and refusing to provide a proper written explanation or response to Plaintiff's QWR.

82.     Plaintiff is informed and believes, and thereon alleges, that these Defendants have engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. §2605.

83.     As a result of Defendants' failure to comply with RESPA, Plaintiff has suffered and continues to suffer damages and costs of suit. Plaintiff is entitled to recover statutory damages, actual damages in an amount to be determined at trial, and costs and reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

### (Against Defendants Morris, UFG, AH, and Bowden)

84.     Plaintiff incorporates here each and every allegation set forth above.

85.     Defendants were agents for the Plaintiff by express and implied contract and by operation of law.

86.     Plaintiff is informed and believes, and thereon alleges that Defendant AH directly

15

FIRST AMENDED COMPLAINT

1 ordered, authorized or participated in Defendants UFG and Bowden's tortious conduct.

2    87.    Plaintiff hired Defendants UFG, Bowden, and Morris as his agents for the purpose

3 of obtaining a Loan to refinance the Property.

4    88.    Pursuant to an agreement between the parties, Plaintiff agreed to pay Defendants a

5 commission from the proceeds of his Loan.

6    89.    Defendants, by and through their agents, owed a fiduciary duty to the Plaintiff to

7 act primarily for his benefit, to act with proper skill and diligence, and not to make a personal

8 profit from the agency at the expense of their principal, the Plaintiff.

9    90.    As Plaintiff's agents, Defendants owed Plaintiff a duty of loyalty and a duty to deal

10 fairly with him at all times.

11    91.    Defendants willfully or recklessly breached their fiduciary duty and duty of loyalty

12 by obtaining a mortgage loan for him that had unfavorable terms and that he could not ultimately

13 afford, by not disclosing the negative consequences of said loan, by securing a secret profit for

14 themselves, by not properly complying with TILA and RESPA requirements, and by engaging in

15 unfair business practices.

16    92.    Defendants AH and Bowden, each through their own action, interfered with

17 Defendants Bowden and Morris's fiduciary obligations by offering Defendants Bowden and

18 Morris incentives to breach their fiduciary duty by means of creating and participating in a scheme

19 that created an illusion to consumers that they are being informed of all of the material facts, when

20 in fact they are not.

21    93.    Plaintiff has been damaged as a result of Defendants' breach, and is entitled to

22 actual damages.

23    94.    Defendants consciously disregarded Plaintiff's rights, deliberately breaching their

24 respective fiduciary duties, showing willful misconduct, malice, fraud, wantonness, oppression

25 and entire want of care, thus authorizing the imposition of punitive damages pursuant to

26 California Civil Code § 3294.

27

28

FIRST AMENDED COMPLAINT

1

## SIXTH CAUSE OF ACTION

2

## FRAUD

3

### (Against all Defendants)

4      95.    Plaintiff incorporates here each and every allegation set forth above.

5      96.    As alleged herein, Defendants Bowden, Morris, and UFG made false

6  representations to Plaintiff regarding material facts, including but not limited to, interest rates,

7  financing options, availability of refinancing, and Plaintiff's qualification for this loan, at the

8  inception of this transaction, designed to fraudulently induce Plaintiff to enter into this

9  transaction.

10      97.    As alleged herein, Defendant AH regularly trained, directed, authorized and/or

11 participated with mortgage brokers to implement this scheme, giving them monetary incentives to

12 violate the borrowers' trust.

13      98.    As alleged herein, Defendant CHL misrepresented to Plaintiff that CHL has the

14 right to collect monies from Plaintiff on its behalf or on behalf of others when Defendant CHL

15 had no legal right to collect such monies.

16      99.    As alleged herein, Defendant MERS misrepresented to Plaintiff on the Deed of

17 Trust that it is a qualified beneficiary with the ability to assign or transfer the Deed of Trust and/or

18 the Note and/or substitute trustees under the Deed of Trust.  Further, Defendant MERS

19 misrepresented that it followed the applicable legal requirements to transfer the Note and Deed of

20 Trust to subsequent beneficiaries.

21      100.   These material representations made by Defendants were false.

22      101.   Defendants knew that these material representations were false when made, or

23 these material representations were made with reckless disregard for the truth.

24      102.   Defendants intended that Plaintiff rely on these material representations.

25      103.   Plaintiff reasonably relied on said representations.

26 ///

27 ///

28

17

FIRST AMENDED COMPLAINT

104.    As a result of Plaintiff's reliance, he was harmed and suffered damages. Plaintiff's reliance on Defendants' false material representations was a substantial factor in causing Plaintiff harm.

105.    Additional evidentiary facts constituting fraud in this matter are within Defendants' knowledge and possession.

106.    Defendants, and each of them, conspired together to perpetrated the fraud alleged herein over the course of several years.

107.    Defendants are guilty of malice, fraud and/or oppression, as defined in California Civil Code § 3294. Defendants' actions were malicious and done willfully, in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such, Plaintiff is entitled to recover, in addition to actual damages, punitive damages to punish Defendants and to deter them from engaging in future misconduct.

## SEVENTH CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 et seq.

### (Against all Defendants)

108.    Plaintiff incorporates here each and every allegation set forth above.

109.    Plaintiff is informed and believes, that Defendants' acts, as alleged herein, constitute unlawful, unfair, and/or fraudulent business practices, as defined in the California Business and Professions Code § 17200 et seq.

110.    As a result of Defendants' wrongful conduct, Plaintiff has suffered various damages and injuries according to proof at trial.

111.    Plaintiff seeks injunctive relief enjoining Defendants from engaging in the unfair business practices described herein.

112.    Plaintiff further seeks restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorneys' fees, and such other and further relief as the Court may deem just and proper.

///

FIRST AMENDED COMPLAINT

**EIGHTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against Defendants Morris, Bowden, and AH)**

113.    Plaintiff incorporates here each and every allegation set forth above.

114.    Plaintiff entered into an agreement with Defendants AH, Morris, and Bowden, whereby Defendants promised to provide Plaintiff with an affordable loan.

115.    Plaintiff fully performed his duties under the contract with Defendants Morris, Bowden, and AH.

116.    Defendants breached their agreement with Plaintiff by failing to exercise reasonable efforts and due diligence as promised, thus failing to provide Plaintiff with an affordable loan.  Defendants also breached their agreement with Plaintiff by committing wrongful acts, including but not limited to, intentionally or negligently failing to obtain payment and interest rates as promised, failing to submit an accurate loan application, failing to supervise, failing to provide loan documents for Plaintiff's review prior to closing, and failing to explain the loan documents to the Plaintiff.  Defendants further breached their duties when they failed to refinance the mortgage as promised, resulting in Plaintiff's payment increasing substantially shortly after the Loan agreement was signed.

117.    As a result of Defendants' wrongful conduct, Plaintiff has suffered various damages and injuries according to proof at trial.

118.    Plaintiff further seeks restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorneys' fees, and such other and further relief as the Court may deem just and proper.

**NINTH CAUSE OF ACTION**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants Morris, Bowden, and AH)**

119.    Plaintiff incorporates here each and every allegation set forth above.

120.    A duty of good faith and fair dealing was implied by law into the contract at issue

FIRST AMENDED COMPLAINT

1   in this action at its inception. Defendants' duties of good faith and fair dealing included, but were
2   not limited to, the following: (1) Defendants had a duty to pay at least as much regard to Plaintiff's
3   financial interests as to Defendants' financial interests; (2) Defendants had a duty to comply with
4   all applicable laws in the State of California; (3) Defendants agreed to act in good faith and deal
5   fairly with Plaintiff when they entered into the mortgage and accepted payments from Plaintiff.
6   Defendants thereby assumed obligations of good faith and fair dealing toward Plaintiff and
7   thereby agreed to abide by such obligations.

8       121.    Nevertheless, Defendants breached the implied duty of good faith and fair dealing
9   owed to Plaintiff by, among other things, performing acts and failing to act as alleged herein, and
10  by failing to perform the duties specifically enumerated herein.  Defendants further breached the
11  duty of good faith and fair dealing by:

12      a.    Failing to pay at least as much regard to Plaintiff's interests as to Defendants'
13            interests;

14      b.    Failing to disclose to Plaintiff the true nature of the loan that is the subject of this
15            action;

16      c.    Failing to give Plaintiff the requisite notice and disclosures.

17      122.    In the absence of a reasonable basis for doing so, and with full knowledge and
18  reckless disregard of the consequences, Defendants acted in bad faith toward Plaintiff by, among
19  other things, failing to comply with all applicable laws.

20      123.    Plaintiff is informed and believes, and thereon alleges that Defendants have a
21  pattern and practice of similar bad faith conduct toward other borrowers who are similarly
22  situated.

23      124.    As a proximate result of Defendants' breaches of the covenant of good faith and
24  fair dealing alleged herein, Plaintiff has suffered damages, incurred attorneys' fees and costs to
25  recover the Property, suffered a loss of reputation and goodwill, suffered emotional distress, and
26  suffered other economic losses and damages in amounts not yet fully ascertained but within the
27  jurisdiction of this Court.

28

20

FIRST AMENDED COMPLAINT

125. Defendants pursued said course of conduct intentionally and maliciously and in conscious disregard of the rights of the Plaintiff. Further, Defendants' refusal to follow through with their duty to assist Plaintiff was made with the intent to intimidate, vex and harass Plaintiff so as to discourage him from pursuing his legal rights under the mortgage law. In order to deter such conduct of Defendants in the future, and to prevent repetition thereof as a practice, by way of punishment and as example, Plaintiff prays that exemplary damages be awarded according to proof at trial pursuant to California Civil Code § 3294.

## DEMAND FOR JURY TRIAL AND PRAYER FOR DAMAGES

Plaintiff William D. Bardin demands a trial by jury.

WHEREFORE, Plaintiff prays for judgment and order against Defendants, as follows:

1. That judgment be entered in Plaintiff's favor and against Defendants, and each of them;

2. For an order requiring Defendants to show cause, if they have any, why they should not be enjoined as set forth below, during the pendency of the action;

3. For a temporary restraining order, preliminary and permanent injunction preventing Defendants, or anyone acting in concert with them, from collecting on the subject Loan and from causing the Property to be sold, assigned or transferred to a third party;

4. For an order stating that Defendants engaged in unfair business practices;

5. For damages, disgorgement, and injunctive relief under California's common and statutory law of unfair business practices;

6. For compensatory and statutory damages, attorneys' fees and costs according to proof at trial;

///
///
///
///

21

FIRST AMENDED COMPLAINT

7.    For exemplary damages in an amount sufficient to punish Defendants' wrongful conduct and deter future misconduct;

8.    For such other and further relief as the Court may deem just and proper.

DATED: September 10, 2009

Respectfully submitted

/s/ Michael J.M. Brook
MICHAEL J.M. BROOK
Attorney for Plaintiff William D. Bardin

22

FIRST AMENDED COMPLAINT

1  <u>**CERTIFICATE OF SERVICE**</u>

2  STATE OF CALIFORNIA        )
                              )ss.
3  COUNTY OF SACRAMENTO )

4      I am a citizen of the United States and a resident of the County of Sacramento.  I am over
the age of 18 years and not a party to the within above-entitled action; my business address is
5  2882 Prospect Park Drive, Ste. 350, Rancho Cordova, ca 95670.

6      On this date I served the foregoing document described as follows: **FIRST AMENDED
COMPLAINT**

7
on the following interested parties in this action:
8
                        SEE ATTACHED SERVICE LIST
9
      The following is the procedure in which service of this document was effected:
10
❑    Facsimile, Time: _____ P.M.; Date:
11
❑    Federal Express, Priority Overnight
12
❑    United Parcel Service, Next Day Air
13
❑    United States Mail,
14
✓    By Electronic Mail - I hereby certify that I electronically transmitted the attached
15    document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of
      Notice of Electronic Filing to the above listed CM/ECF registrants.
16
      I declare under penalty of perjury that the foregoing is true and correct under the
17  laws of the State of California and that this declaration was executed on September 11, 2009 at
Sacramento, California.
18

19                        /s/ Letitia Brazier
                          LETITIA A. BRAZIER
20

21

22

23

24

25

26

27

28

---

23

FIRST AMENDED COMPLAINT

## SERVICE LIST

| | |
|---|---|
| **Jeffrey Dean Farrow** | Representing |
| Michelman & Robinson, LLP | |
| 4 Hutton Centre, Suite 300 | Defendant Americahomekey, Inc. |
| Santa Ana, CA 92707 | |
| jfarrow@mrllp.com | |

**Robert Alan Padway**

Representing

Bryan Cave LLP

2 Embarcadero Center, Suite 1410

Defendant Bank Of America

San Francisco, CA 94111

robert.padway@bryancave.com

Defendant Mortgage Electronic Registration Systems, Inc.

**David Nathan de Ruig**

Bryan Cave LLP

2 Embarcadero Center, Suite 1410

San Francisco, CA 94111

david.deruig@bryancave.com

24

CIVIL

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:09-cv-01592-GEB-KJM

Bardin v. Bank Of America et al                        Date Filed: 06/08/2009
Assigned to: Judge Garland E. Burrell, Jr             Jury Demand: Both
Referred to: Magistrate Judge Kimberly J. Mueller     Nature of Suit: 140 Negotiable
Cause: 15:1601 Truth in Lending                       Instrument
                                                      Jurisdiction: Federal Question

**Plaintiff**

**William D. Bardin**                    represented by  **Michael J.M. Brook**
                                                        Lanahan and Reilley LLP
                                                        600 Bicentennial Way
                                                        Suite 300
                                                        Santa Rosa , CA 95403
                                                        707-524-4200
                                                        Fax: 707-523-4610
                                                        Email: mbrook@lanahan.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bank Of America**                      represented by  **David Nathan de Ruig**
                                                        Bryan Cave LLP
                                                        2 Embarcadero Center
                                                        Suite 1410
                                                        San Francisco , CA 94111
                                                        415-675-3409
                                                        Fax: 415-675-3434
                                                        Email: david.deruig@bryancave.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Robert Alan Padway**
                                                        Bryan Cave LLP
                                                        2 Embarcadero Center
                                                        Suite 1410
                                                        San Francisco , CA 94111
                                                        415-675-3428
                                                        Fax: 415-675-3434
                                                        Email: robert.padway@bryancave.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**America Homekey, Inc.**                represented by   **Jeffrey Dean Farrow**
                                                          Michelman & Robinson, LLP
                                                          4 Hutton Centre
                                                          Suite 300
                                                          Santa Ana , CA 92707
                                                          714-557-7990
                                                          Fax: 714-557-7991
                                                          Email: jfarrow@mrllp.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Mortgage Electronic Registration**     represented by   **David Nathan de Ruig**
**Systems, Inc.**                                         (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Robert Alan Padway**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Funding Group, Inc.**

**Defendant**

**John Morris**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/08/2009 | 1 | COMPLAINT against all defendants by William Bardin.(Brook, Michael) (Entered: 06/08/2009) |
| 06/08/2009 | 2 | CIVIL COVER SHEET by William Bardin (Brook, Michael) (Entered: 06/08/2009) |
| 06/09/2009 | | RECEIPT number #CAE200017515 $350.00 fbo William D. Bardin by James D. Sandison on 6/9/2009. (Benson, A.) (Entered: 06/09/2009) |
| 06/09/2009 | 4 | SUMMONS ISSUED as to *Bank Of America, America Homekey, Inc., Mortgage Electronic Registration Systems, Inc., U.S. Funding Group, Inc., John Morris* with answer to complaint due within *20* days. Attorney *Michael J.M. Brook* *Lanahan and Reilley LLP* *600 Bicentennial Way, Ste. 300* *Santa Rosa, CA 95403*. (Benson, A.) (Entered: 06/09/2009) |
| 06/09/2009 | 5 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference |

|  |  | set for 09/21/09 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell, Jr. (Attachments: # 1 Consent Forms, # 2 VDRP Forms) (Benson, A.) (Entered: 06/09/2009) |
|---|---|---|
| 06/23/2009 | 6 | SUMMONS RETURNED EXECUTED: Mortgage Electronic Registration Systems, Inc. served on 6/12/2009, answer due 7/2/2009. (Brook, Michael) (Entered: 06/23/2009) |
| 07/02/2009 | 7 | STIPULATION re 1 Complaint,Extending Time for Defendants to Respond to Complaint by Bank Of America, Mortgage Electronic Registration Systems, Inc.. Attorney Padway, Robert Alan added. (Padway, Robert) Modified on 7/7/2009 (Kaminski, H). (Entered: 07/02/2009) |
| 07/03/2009 | 8 | SUMMONS RETURNED EXECUTED: Bank Of America served on 6/17/2009, answer due 7/7/2009; America Homekey, Inc. served on 6/17/2009, answer due 7/7/2009. (Brook, Michael) (Entered: 07/03/2009) |
| 07/07/2009 | 9 | ANSWER to COMPLAINT with Jury Demand by America Homekey, Inc.. Attorney Farrow, Jeffrey Dean added.(Farrow, Jeffrey) (Entered: 07/07/2009) |
| 07/16/2009 | 10 | SUMMONS RETURNED EXECUTED: U.S. Funding Group, Inc. served on 7/1/2009, answer due 7/21/2009. (Brook, Michael) (Entered: 07/16/2009) |
| 08/06/2009 | 11 | MOTION to DISMISS by Bank Of America, Mortgage Electronic Registration Systems, Inc.. Attorney de Ruig, David Nathan added. Motion Hearing set for 9/28/2009 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr.. (Attachments: # 1 Request for Judicial Notice, # 2 Exhibits to Request for Judicial Notice, # 3 Proposed Order, # 4 Corporate Disclosure Statement)(de Ruig, David) (Entered: 08/06/2009) |
| 08/13/2009 | 12 | SUMMONS RETURNED EXECUTED: John Morris served on 7/18/2009, answer due 8/7/2009. (Brook, Michael) (Entered: 08/13/2009) |
| 09/08/2009 | 13 | JOINT STATUS REPORT by Bank Of America, Mortgage Electronic Registration Systems, Inc.. (de Ruig, David) (Entered: 09/08/2009) |
| 09/11/2009 | 14 | AMENDED COMPLAINT against all defendants by William D. Bardin. (Brook, Michael) (Entered: 09/11/2009) |
| 09/17/2009 | 15 | ORDER signed by Judge Garland E. Burrell, Jr. on 9/17/2009 ORDERING 11 Since Defendants' pending motions do not address the operative pleading, the motions are DENIED AS MOOT. The Defendants have 10 days from the date of this Order to respond to the Plaintiff's first amended complaint. (Reader, L) (Entered: 09/17/2009) |
| 09/18/2009 | 16 | STATUS (PRETRIAL SCHEDULING) ORDER signed by Judge Garland E. Burrell, Jr on 9/18/2009: Designation of Expert Witnesses due by 5/7/2010, Discovery due by 10/6/2010, Dispositive Motions due by 12/6/2010, Final Pretrial Conference set for 2/7/2011 at 01:30 PM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr., Trial set for 5/3/2011 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr. (Waggoner, D) (Entered: 09/18/2009) |
| 09/28/2009 | 17 | MOTION to DISMISS by America Homekey, Inc.. Motion Hearing set for |

|            |    |                                                                                                                                                                                                                                                                                                                     |
|------------|----|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |    | 11/23/2009 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr.. (Attachments: # 1 Request for Judicial Notice, # 2 Proposed Order Proposed Order Granting Motion to Dismiss)(Farrow, Jeffrey) (Entered: 09/28/2009)                                                                                   |
| 10/01/2009 | 18 | MOTION to DISMISS by Bank Of America, Mortgage Electronic Registration Systems, Inc.. Motion Hearing set for 11/9/2009 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr.. (Attachments: # 1 Request for Judicial Notice, # 2 RJN Exhibits, # 3 Proposed Order)(de Ruig, David) (Entered: 10/01/2009) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/07/2009 09:55:54 | | | |
| **PACER Login:** | mr0843 | **Client Code:** | 04121.0011 |
| **Description:** | Docket Report | **Search Criteria:** | 2:09-cv-01592-GEB-KJM |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

**PROOF OF SERVICE**

<u>**Case Name: Bardin v. Countrywide Homes, et al.**</u>
**USDC (Eastern District) Case No.: 2:09-CV-01593-WBS-KJM**

      I, the undersigned, declare under penalty of perjury that I am over the age of eighteen and not a party to the within action. I am employed in the County of Orange, State of California. My business address is 4 Hutton Centre Dr., Suite 300, Santa Ana, California 92707.

      On October 8, 2009, I served the foregoing document described as  REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT AND TO STRIKE REQUEST FOR PUNITIVE DAMAGES  on all interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

(X)    **BY CM/ECF** for parties that are CM/ECF participants. Service is being made electronically on those parties on the attached list that are registered users of the Court's Electronic Case Filing System.

( )    **BY U.S. MAIL** for parties that are not CM/ECF participants.  I caused such envelope to be deposited in the mail at Santa Ana, California.  The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of  business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

(X)    (FEDERAL)  I declare under penalty of perjury that the foregoing is true and correct.

      Executed on October 8, 2009 at Santa Ana, California.

                                    _____
                                      Henrietta McCarthy

1

<u>**SERVICE LIST**</u>

<u>**Service by Electronic Case Filing System:**</u>

**Michael J.M. Brook, Esq.**
Lanahan and Reilley LLP
600 Bicentennial Way, Ste. 300
Santa Rosa, CA 9540308-286-8932
T:  707-524-4200; F:  707-523-4610
*Email: mbrook@lanahan.com*
Attorney for Plaintiff, **William D. Bardin**

**David Nathan de Ruig, Esq.**
Bryan Cave LLP
2 Embarcadero Center, Ste. 1410
San Francisco, CA 94111
T:  415-675-3409; F:  415-675-3434
*Email: david.deruig@bryancave.com*
Attorney for Defendant, **Countrywide Home Loans, Inc.**

**Robert Alan Padway, Esq.**
Bryan Cave LLP
2 Embarcadero Center, Ste. 1410
San Francisco, CA 94111
T:  415-675-3428; F:  415-675-3434
*Email: robertpadway@bryancave.com*
Attorney for Defendant, **Countrywide Home Loans, Inc.**

**David Nathan de Ruig, Esq.**
Bryan Cave LLP
2 Embarcadero Center, Ste. 1410
San Francisco, CA 94111
T:  415-675-3409; F:  415-675-3434
*Email: david.deruig@bryancave.com*
Attorney for Defendant, **Mortgage Electronic Registration Systems, Inc.**

**Robert Alan Padway, Esq.**
Bryan Cave LLP
2 Embarcadero Center, Ste. 1410
San Francisco, CA 94111
T:  415-675-3428; F:  415-675-3434
*Email: robertpadway@bryancave.com*
Attorney for Defendant, **Mortgage Electronic Registration Systems, Inc.**

2